2012 UT 33

**Wonzie BARRIENTOS, a minor child and heir of Jessica NELSON, deceased, by and through her conservator, Theresa Nelson, Plaintiff and Appellant,**

v.

**Matt JONES, Ogden City, and John & Jane Does 1–15, Defendants and Appellees.**

No. 20100277.

Supreme Court of Utah.

June 8, 2012.

Robert B. Sykes, Robert J. Fuller, Salt Lake City, for appellant.

Allan L. Larson, Heather S. White, Salt Lake City, for appellees.

Associate Chief Justice NEHRING authored the opinion of the Court, in which Chief Justice DURRANT, Justice DURHAM, and Justice PARRISH joined.

Justice LEE filed a dissenting opinion.

Associate Chief Justice NEHRING, opinion of the Court:

## INTRODUCTION

¶ 1 Eighteen-month-old Wonzie Barrientos's mother, Jessica Nelson, was killed in a car accident, the tragic result of a high-speed chase in which an Ogden City police officer pursued a speeding car that ultimately crashed into Nelson's car. Plaintiff sued the police officer and Ogden City for negligence. Ogden City defended the case on the ground that it had governmental immunity and, if it did not, that it was not negligent. Ogden City won at trial[1] and Plaintiff moved for a new trial. The trial court denied her motion and she appeals. She offers us many theories, any one of which could be sufficient for us to reverse the trial court and remand for a new trial. We conclude that the trial court abused its discretion when it refused to grant her a new trial. We reach this result because Ogden City's lawyer violated Orders in Limine by asking inflammatory questions that served no purpose other than to create prejudice. We reverse and remand for a new trial.

## BACKGROUND

¶ 2 At approximately 11 p.m. on December 12, 2005, 62–year–old Philemon "Bob" Ellis visited 21–year–old Jessica Nelson at the home of her stepmother, Theresa Nelson. Mr. Ellis asked Jessica to give him a ride. Jessica left her 18–month–old daughter, Wonzie Barrientos, in Theresa's care and drove away with Mr. Ellis as her passenger. Later that night, at 3 a.m., Jessica, still with Mr. Ellis as a passenger, was passing through a green light at the intersection of

---

1. Plaintiff did not appeal the jury verdict that Officer Jones was not personally liable. Plaintiff acquiesced to the dismissal of Officer Jones only for the purposes of withdrawing any punitive damage claim against him personally, but maintained her action against him in his capacity as an agent of Ogden City.

24th Street and Grant Avenue in Ogden, Utah, when they were broadsided by a car driven by Eddie Bustos.

¶ 3 Mr. Bustos was hurtling down Grant Avenue at approximately eighty miles per hour. He was being chased in hot pursuit by Officer Matt Jones of the Ogden City Police Department. Officer Jones had begun his pursuit approximately seven minutes before the accident, when he suspected Mr. Bustos of visiting a "drug house." Officer Jones thought he saw Mr. Bustos violate several traffic laws and decided to pull him over. Officer Jones activated his overhead lights, but Mr. Bustos did not stop. Officer Jones then turned on his siren, but Mr. Bustos still did not stop. Once Mr. Bustos turned onto Grant Avenue, the high-speed chase began. A dispatch log recorded the entire audio of the chase, which lasted approximately one minute.

¶ 4 Officer Jones's patrol vehicle was equipped with a GPS system that plotted his speed, direction, and distance traveled every five seconds. The log shows that Officer Jones's vehicle traveled 7,078 feet in 77 seconds, for an average speed of 62.5 miles per hour. Officer Jones's top speed was 83.5 miles per hour. He traversed ten intersections with five traffic lights. Officer Jones was twice ordered to terminate the chase by his superior, Sargent Burnett. Officer Jones did not hear the first order because he and Sargent Burnett had been speaking at the same time and this made their radios "cover" each other such that neither could hear the other. Shortly after hearing the second order, he turned off his sirens and lights and slowed down. Moments later, Mr. Bustos's car crashed into Jessica's car, instantly killing her and Mr. Ellis.

¶ 5 Plaintiff sued Ogden City and Officer Jones for negligence and sought damages. The jury answered "No" to this question: "Was Ogden City/Jones at fault in the pursuit of Eddie Bustos?" The jury also answered "No" to the question: "Was Ogden City negligent in failing to enact proper policies regarding how to terminate a pursuit?"

¶ 6 Plaintiff moved for a new trial, citing several grounds. The trial court denied her motion. She appeals. The facts relevant to each of her claims are discussed below. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j).

## STANDARDS OF REVIEW

■ ¶ 7 We first address Plaintiff's claim that she is entitled to a new trial because Ogden City's counsel violated various orders in limine, which may have resulted in prejudice. Motions for a new trial are governed by rule 59 of the Utah Rules of Civil Procedure.

> Because the grant of a new trial is ordinarily left to the sound discretion of the trial court, we will review the court's decision in this regard under an abuse of discretion standard. Moreover, we have stated that absent a showing by the appellant that the trial outcome would have differed, every reasonable presumption as to the validity of the verdict below must be taken as true upon appeal.[2]

■ ¶ 8 We next consider Plaintiff's argument that the trial court erred when it admitted Exhibit D-101 without authentication. Because this decision relied on the trial court's interpretation of the rules of evidence, we review its conclusion for correctness.[3]

■ ¶ 9 Plaintiff also argues that she was entitled to a directed verdict that Ogden City was negligent, on the grounds that its policy did not comply with Utah Code section 41-6a-212.

> When reviewing any challenge to a trial court's denial of a motion for directed verdict, we review the evidence and all reasonable inferences that may fairly be drawn therefrom in the light most favorable to the party moved against, and will sustain the denial if reasonable minds could disagree with the ground asserted for directing a verdict.[4]

---

**2.** *Child v. Gonda*, 972 P.2d 425, 429 (Utah 1998) (citations omitted).

**3.** *See Cal Wadsworth Const. v. City of St. George*, 898 P.2d 1372, 1378 (Utah 1995).

**4.** *Mahmood v. Ross*, 1999 UT 104, ¶ 16, 990 P.2d

If the trial court's denial of a motion for directed verdict relies upon any underlying legal conclusions, we review those conclusions for correctness.[5]

¶ 10 Finally, Plaintiff argues that the trial court abused its discretion when it excluded evidence concerning Officer Jones's on-the-job dishonesty. "[W]e grant a trial court broad discretion to admit or exclude evidence and will disturb its ruling only for abuse of discretion. . . . [W]e will not reverse a trial court's ruling on evidence unless the ruling was beyond the limits of reasonability." [6]

## ANALYSIS

### I. PLAINTIFF IS ENTITLED TO A NEW TRIAL BECAUSE OGDEN CITY'S LAWYER REPEATEDLY VIOLATED THE TRIAL COURT'S ORDERS IN LIMINE

¶ 11 We first address Plaintiff's argument that she is entitled to a new trial because Ogden City's lawyers violated several orders in limine. The orders in limine were granted to prevent the introduction of any evidence attacking Jessica's character because any such evidence was irrelevant to the fact that she was killed. The pertinent orders blocked evidence of the following:

(1) whether Jessica was "hooking" or looking for drugs on the night of the accident. The trial court stated, "Any such evidence is not relevant to any issue in the case and is thus inadmissible. . . . Even if the Court were to find that such evidence has some relevance, the Court would find that whatever probative value it has is substantially outweighed by the danger of unfair prejudice and is thus inadmissible."

(2) speculation about where Jessica and Mr. Ellis were going or what they were doing on the night of the accident. The trial court stated, "The Court agrees with [Ogden City] that it is somewhat relevant

933.

that Jessica was out in the middle of the night instead of at home with her daughter. However, it is irrelevant what Jessica was *doing* while she was out. What Jessica was doing three hours before the accident is no more relevant than what she was doing three days or three weeks before the accident."

(3) Mr. Ellis's previous drug use and criminal records. The trial court stated, "This evidence is irrelevant to any issue in this case."

(4) prior misconduct by Jessica's father, Thomas Nelson. The trial court stated, "Thomas Nelson is not and has never been a party in this case and has not brought a claim for damages. Therefore, any alleged misconduct on his part is irrelevant to any issue in this case."

¶ 12 The trial court also granted orders in limine excluding evidence concerning the lack of stability in Jessica's childhood, the toxicology report indicating that Jessica was using drugs the night of the accident, and various other items. The trial court excluded all of this evidence as irrelevant or unfairly prejudicial.

¶ 13 But at trial, Ogden City, represented by Ms. White, repeatedly asked questions regarding these forbidden topics. Plaintiff, represented by Mr. Sykes, repeatedly objected to these questions and the trial court sustained some of those objections. Ogden City asked the objectionable questions during its cross-examination of Jessica's stepmother, Theresa. The relevant portion of the transcript is reproduced here:

Ms. White: . . . You testified that you, and Jessica, [and Jessica's sisters] were at home the evening of December 13th, 2005?

Theresa: Yeah. Me, Wonzie, . . . [and Jessica's sisters].

Q: I didn't hear Thomas's name anywhere in there.

**5.** *See Markham v. Bradley*, 2007 UT App 379, ¶ 13, 173 P.3d 865 ("When reviewing the denial of a motion for [a directed verdict], an appellate court should defer to the trial court's findings and inferences under a clearly erroneous standard and review the trial court's conclusions of law for correctness.").

**6.** *Daines v. Vincent*, 2008 UT 51, ¶ 21, 190 P.3d 1269 (citation omitted) (internal quotation marks omitted).

A: No.

Q: Where is he?

A: He was in Colorado.

Q: What was he doing in Colorado? [7]

Mr. Sykes: And I object. That's irrelevant. Also I think it was a matter of a motion in limine.

. . .

The Court: Okay. I'm going to sustain the objection. Let's leave out what he was doing there, but just the fact that he was gone.

. . .

Q: All right. So let's go back to you and the girls at home. . . . [Bob] Ellis called Jessica around 11:00 asking for a ride, correct?

A: Yes. About 10:30, 11:00. I can't remember for sure.

Q: Okay. Did you think that was odd that he would be calling her that late at night for a ride?

Mr. Sykes: Objection, Your Honor. That's irrelevant. What's odd and what's not odd?

. . .

The Court: I don't know that it's [violated the order in limine] at this point. So I'm not going to sustain the objection at this point.

Q: The question was, did you think that was odd for . . . Mr. Ellis . . . to call Jessica at 10:30 at night for a ride?

A: I don't think she'd ever took him at that time at night.

Q: So—

A: I told her it was too late to be going.

Q: Okay. Did she listen to you?

A: She said she'd only be a minute.

Q: Okay. And I think you've said that he'd call weekly for rides?

A: Yeah. Probably once a week or every other week, something like that.

Q: Okay. . . . And he would give her money in return for those rides, wouldn't he?

A: Gas money.

. . .

Q: . . . you said she said . . . she wouldn't be long? . . . but she left at about 11:30—about 11:00, and the accident occurred at 3:00 . . . in the morning. Do you have—that's, as I count it, that's a four—four and a half hour gap, correct, that she was gone?

A: Correct.

Q: Do you have any idea what she was doing during that four hours?

A: No.

Q: No idea whatsoever?

A: I don't know.

Q: Okay. Do you have any idea where she and [Bob] Ellis had gone?

A: She said she was taking him home, giving him a ride home.

Q: Okay . . .

. . .

Q: Do you find it odd that—well, ask—let me ask this. How old was Bob Ellis . . . ?

A: He was 62.

Q: And Jessica—okay, and Jessica was how old?

A: She was 21.

Q: Okay. Do you find it odd that he would frequently call your daughter for rides at this time particularly . . . in the middle of the night?

A: Well . . .

Mr. Sykes: Your Honor, I object. . . . It's irrelevant. It[ ] also goes to another motion in limine.

Ms. White: I don't believe it goes to a motion in limine, Your Honor, but I'll withdraw the question.

. . .

Q: Did it concern you that she was leaving—that she had left for four and a half hours in the middle of the night—. . . and left her daughter alone . . . was out with these men doing who knows what?

Mr. Sykes: Your Honor, I object. . . . We'll move to strike. That's improper, and she knows it.

---

7. Thomas Nelson was in prison in Colorado.

Ms. White: I don't believe it's improper, Your Honor.

Mr. Sykes: Trying to suggest some kind of a dark motive for—

The Court: Well, I'll strike the portion who knows what.

Ms. White: Well, Ms.—the reason for the who knows what, Your Honor, was that Ms. Nelson testified she didn't know what—that she was doing.

The Court: It's more the inference that comes from the phrase.

Ms. White: Okay.

Q: Well, doing you didn't know what?

A: Yeah. I was asleep. I didn't know that she was gone—

Q: Okay.

Mr. Sykes: Your Honor, I object. It's the same thing. . . . Just restated a different way with the defendant.

The Court: I think the connotation is correct, though. So I'm going—I overrule the objection on the second one. It was the connotation on the first phrase that bothered me.

Q: Now, you testified on direct that you had known Bob Ellis for many years?

A: Yes.

Q: Did you know that he had a criminal history dealing with prostitution?

Mr. Sykes: Objection, Your Honor. That is absolutely . . . outrageous. We've got a motion in limine on a lot of this stuff. Bob Ellis is dead, and his history has nothing to do with this and she's trying to besmirch Jessica Nelson by using this improperly, and she knows it.

. . .

Ms. White: I'll move on, Your Honor.

The Court: Okay.

Mr. Sykes: Will you sustain the objection, Your Honor.

The Court: Okay. I will.

¶ 14 After trial, Plaintiff moved for a new trial. She made many arguments, one of which was that cumulative errors denied her a fair trial. She argued that Ogden City's examination of Theresa Nelson implied that "Jessica Nelson had done something wrong that evening, been on drugs or was prostituting herself." The trial court denied Plaintiff's motion for a new trial. The trial court wrote that "the Court was surprised to hear the question [about Mr. Ellis's prostitution history], especially because it was in direct violation of a pre-trial order on the subject." Nevertheless, the trial court determined that "the prejudice to Plaintiff as a result was relatively minor, considering Plaintiff's counsel's quick objection, the Court's sustainment of the objection, and the fact that the witness did not answer the question." The court also wrote this footnote:

> The Court notes that Plaintiff's counsel similarly violated a pre-trial order when he asked questions concerning the reasons for Officer Jones's termination. That violation was just as clear and just as sudden as the violation Plaintiff complains of here. In both instances, the objection by opposing counsel was quick, the Court sustained the objection, and questioning continued. The Court does not believe either instance had a significant impact on the fairness of the trial for either party.

¶ 15 Rule 59 allows a new trial to be granted for "[i]rregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion by which either party was prevented from having a fair trial." [8] This rule is only in force "[s]ubject to the provisions of Rule 61," [9] which states:

> No error in either the admission or the exclusion of evidence, and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties, is ground for granting a new trial or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage

---

**8.** Utah R. Civ. P. 59(a)(1). We note that although Plaintiff's appellate brief never actually cites to rule 59, the trial court addressed the motion as such. We accordingly conclude that the argument is preserved.

**9.** *Id.* 59(a).

of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.[10]

¶ 16 The question before us, then, is whether the admitted evidence "affect[ed] the substantial rights of the parties." If so, it was grounds for a new trial. If not, the trial court did not abuse its discretion in denying the motion for a new trial. We have stated, "absent a showing by the appellant that the trial outcome would have differed, every reasonable presumption as to the validity of the verdict below must be taken as true upon appeal."[11] However, "[t]he erroneous admission of . . . testimony might be compared to a drop of ink placed in a vessel of milk. It cannot long be seen, but it surely remains there to pollute its contents."[12]

■ ¶ 17 Plaintiff argues that the implication that Jessica and Mr. Ellis were engaged in some kind of prostitution scheme affected the verdict by undermining Jessica's character. Plaintiff contends that

> [a]ccording to our laws and social values, prostitutes are criminals who should be punished, not rewarded with a verdict. . . . There is a reasonable likelihood that the jury would have viewed the evidence in favor of Plaintiff's case more favorably had Ogden [City] not planted the seed, without any basis, that Jessica and her passenger were involved in criminal activity. . . . There was no reason for Ogden [City] to violate the Motions in Limine nor to ask any question regarding prostitution, other than to unfairly assassinate Jessica's character.

¶ 18 In response, Ogden City makes several defenses. Ogden City contends that its questions did not violate the orders in limine, that Plaintiff's attorney did not object to the questions at trial, that defense counsel apologized to the court for asking the question about Mr. Ellis's criminal history even while contending that she did not intentionally violate the court's pretrial order, and that it was

difficult even for Plaintiff's attorney to remember all of the motions in limine and corresponding orders. Above all, Ogden City contends that Plaintiff cannot meet her burden of establishing the questioning had a direct effect on the verdict. Ogden City argues that "[a]ny potential prejudice went only to damages, and the jury did not reach the issue of damages because it concluded in its verdict that the defendants were not at fault."

■ ¶ 19 We agree with Plaintiff. The essential issue before the jury was whether Ogden City was negligent in pursuing a high-speed chase. Jessica's presence in the intersection was tragic and random. What she was doing in the intersection was irrelevant, what she had been doing that night was irrelevant, and any prior life history of either Jessica or Mr. Ellis was irrelevant. The questioning therefore could not have served any relevant purpose. Instead, the evidence served only to prejudice the jury.

> Evidence is unfairly prejudicial in this context if it has a tendency to influence the outcome of the trial by improper means, or if it appeals to the jury's sympathies, or arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions of the case.[13]

¶ 20 Ogden City argues that the questioning was relevant to the damages to which Plaintiff was entitled. It was not. Whether Mr. Ellis and Jessica were engaged in prostitution, or looking for drugs, or simply driving around in the moonlight, in no way bears on the issues to be decided at the trial. At most, Ogden City could only hope to reduce Plaintiff's damages by making Jessica a less sympathetic character.

■ ¶ 21 This case illustrates the reason that "evidence relating only to damages may properly be excluded because in the context

---

10. *Id.* 61.

11. *Child v. Gonda*, 972 P.2d 425, 429 (Utah 1998).

12. *Pearce v. Wistisen*, 701 P.2d 489, 494 (Utah 1985).

13. *State v. Toki*, 2011 UT App 293, ¶ 44, 263 P.3d 481 (internal quotation marks omitted).

of the trial its value on the issue of damages is outweighed by its prejudicial effect on the principal issue of liability." [14] Even if Ogden City's line of questioning were somehow relevant to Plaintiff's damages, we easily conclude that the probative value of the questioning was "substantially outweighed by the danger of unfair prejudice" [15] and should therefore have remained excluded.

¶ 22 The conduct of Ogden City's counsel, Ms. White, was indefensible. Her questioning of Theresa reveals that Ms. White surrendered, without resistance, to the impulse to win her case by bludgeoning the character of the dead. She pursued this course of action undeterred by court orders that unequivocally forbade her chosen course of action. We condemn Ms. White's conduct. We admonish her during the retrial of this case to exercise hyper-vigilance in the cause of scrupulously avoiding improper questioning. We are also moved to take note of the false refuge Ms. White might seek by invoking the trial court's statement that "Plaintiff's counsel similarly violated a pretrial order when he asked questions concerning the reasons for Officer Jones's termination." We have independently reviewed the record on this point. What stands out about Plaintiff's counsel's transgression is that it was a one-time event. By contrast, Ms. White was relentless in her pursuit of evidence of bad character.

¶ 23 Thus, we conclude that the trial court erred in not granting Plaintiff a new trial on the ground that Ogden City had violated the orders in limine in a way that was prejudicial to Plaintiff's case. We accordingly reverse and remand for a new trial.

¶ 24 To aid the trial court on remand, we offer guidance on Plaintiff's remaining issues.

## II. GUIDANCE FOR THE TRIAL COURT ON REMAND

### A. The Trial Court Erred in Admitting Exhibit D–101 Without Authentication

■ ¶ 25 Plaintiff challenges the trial court's admission of Exhibit D–101 despite a complete lack of authentication. Exhibit D–101 purported to be a "Utah Model Pursuit Policy," outlining the state's model high-speed pursuit policy. It is a typed, double-spaced memorandum. It contains no identification, no signatures, no notary seals, no logos, nor any other form of authentication. Ogden City attempted to introduce the exhibit on the fourth day of trial during cross-examination of Lieutenant Acker, one of Plaintiff's witnesses. But Ogden City had never provided the document to Plaintiff. Plaintiff objected because the document had not been provided to her. The trial court did not admit the document at that time. But later in the day, Ogden City again referred to the document during the direct testimony of its pursuit expert, Mr. John Tierney. Plaintiff again objected. Ogden City's counsel stated, "Well, [Mr. Tierney] can just talk about it in the generic sense. We won't—we don't need to talk about it right now. It's not admissible anyway."

¶ 26 But a lengthy exchange followed. Ultimately, the trial court decided not to rule on the issue until Monday morning; it was then Friday afternoon. The court asked the attorneys to "work together" to try to authenticate it over the weekend "and then see where we're at." On Monday, without any new evidence of authenticity, the trial court admitted Exhibit D–101 over renewed objection. Plaintiff again questioned the admission, but the trial court allowed it.

¶ 27 In denying Plaintiff's motion for a new trial, the trial court supported its decision to admit Exhibit D–101. The trial court wrote, "After reviewing the audio recording of relevant portions of the trial, the Court shares [Plaintiff's] concern about the foundation of this exhibit." But the trial court then relied on rule 703 of the Utah Rules of Evidence, which allows an expert to rely on facts or data "reasonably relied upon by experts in the particular field in forming opinions or inferences," even if the facts or data are

---

**14.** *Terry v. Zions Coop. Mercantile Inst.*, 605 P.2d 314, 323 n. 31 (Utah 1979) (citation omitted), *overruled on other grounds*, *McFarland v. Skaggs Cos. Inc.*, 678 P.2d 298 (Utah 1984).

**15.** Utah R. Evid. 403.

inadmissible.[16] However, under rule 703, "[f]acts or data that are otherwise inadmissible shall not be disclosed to the jury ... unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." [17] The court thus decided to balance the probative value of Exhibit D–101 against its prejudicial effect.

¶ 28 In doing so, the trial court determined that Exhibit D–101's probative value was "high" because "[i]n order to evaluate Mr. Tierney's conclusion [that Ogden City's pursuit policy complied with the Utah Model Pursuit Policy in effect at the time,] it would have been helpful for the jury to examine the Utah Model Pursuit Policy for themselves." On the other hand, the court determined that "[t]he only prejudice the Court can see from the admission of this exhibit would arise only if the exhibit actually was not what it purported to be," in which case, "[t]he exhibit could have improperly influenced the jury to accept Mr. Tierney's conclusions, resulting in a tainted answer to one of the ultimate issues in the case; namely, whether Ogden City was negligent in failing to enact proper policies regarding how to terminate a pursuit."

¶ 29 But then, rather than weighing the probative value against the prejudicial value, as rule 703 requires, the trial court determined that "it is [Plaintiff's] burden, on her motion for new trial, to show that this prejudice actually exists. In other words, [Plaintiff] must establish that the exhibit in fact was not what it purported to be. She simply has not carried that burden." The trial court continued:

> In addition to [Plaintiff's] failure to meet her burden on this post-trial motion, [Plaintiff's] counsel could have taken some simple steps before and during trial to verify the authenticity of this document. In particular, [Plaintiff's] counsel chose not to depose Mr. Tierney [or] question[ ] Mr. Tierney at trial concerning whether the model policy was in fact in effect at the time of the accident and, if it was not,

whether that fact would have changed his opinion in any material way.

Thus, the trial court found no prejudice to Plaintiff "[i]n the absence of any evidence that [Exhibit D–101] was not what it purported to be."

 ¶ 30 On appeal, Plaintiff asks us to grant her a new trial on the ground that Exhibit D–101 should not have been admitted, and that its admission was highly prejudicial. Plaintiff asserts that the trial court improperly shifted the burden to her to prove that Exhibit D–101 was inadmissible. She also insists that the trial court erred when it asked the parties to "work together" to authenticate Ogden City's document, and then suggested that it was Plaintiff's responsibility to prove that the document was not what it purported to be. Plaintiff is correct. The trial court misapprehended the application of the rules of evidence and should not have admitted Exhibit D–101.

 ¶ 31 Documents may be admitted, after authentication, under rule 901 of the Utah Rules of Evidence, which states in part, that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." [18] This rule squarely places the burden of authenticating the document on the party seeking its admission. The challenging party may, of course, seek to disprove this authentication, but the initial burden does not lie there. In the case at hand, the trial court interpreted rule 703 in such a way as to circumvent rule 901's clear placement of the burden of proof. The trial court relied on rule 703 to allow "otherwise inadmissible," unauthenticated evidence to be admitted because the opposing party had not disproved its authenticity. There is no principled reason for doing so and we reject this analysis.

 ¶ 32 We next turn to the trial court's balancing of Exhibit D–101's probative and prejudicial characteristics. The trial court conceded that the exhibit had probative value

---

**16.** Utah R. Evid. 703.

**17.** *Id.*

**18.** Utah R. Evid. 901(a).

when it stated that "it would have been helpful for the jury to examine the Utah Model Pursuit Policy for themselves." On the other side of the scale, the trial court wrote that "[t]he only prejudice the [c]ourt can see [is] if the exhibit actually was not what it purported to be," and then placed the burden on Plaintiff to prove that the exhibit was not what it purported to be. In our view, the risk that the exhibit "actually was not what it purported to be" was substantial. And because we reject the trial court's placement of the burden of authentication on Plaintiff, we easily conclude that the prejudicial effect of the document outweighed its probative value. Thus, on remand we instruct the trial court to either exclude the document or require the defense to authenticate it.

*B. Ogden City's Policy Did Not Comply With Utah Code 41–6a–212, and Ogden City is Not, Therefore, Entitled to Immunity. But Plaintiff is Not Entitled to a Directed Verdict on the Question of Ogden City's Negligence*

¶ 33 Plaintiff asked the trial court to direct a verdict in her favor on the ground that Ogden City's policy did not meet the requirements of section 41–6a–212 and therefore, Officer Jones had no right to speed. The trial court denied the motion and also refused to give a negligence jury instruction establishing Ogden City's negligence. On appeal, Plaintiff asks us to reverse the trial court's decision and determine that Ogden City was negligent as a matter of law.

¶ 34 We agree with Plaintiff that Ogden City's policy did not meet the requirements of Utah Code section 41–6a–212. That section grants privileges to emergency vehicles when, among other things, "the public agency employing the operator of the vehicle has, in effect, a written policy which describes the manner and circumstances in which any vehicle pursuit should be conducted and terminated." [19] Here, Ogden City had a written policy describing the circumstances, but not the manner, in which any vehicle pursuit should be conducted and terminated:

I. Termination of Pursuit:

1. A decision to terminate pursuit may be the most rational means of preserving the lives and property of both the public and the officers and suspects engaged in pursuit. The officers involved in the pursuit must continually question whether the seriousness of the violation and the other factors considered in initiating the pursuit reasonably warrant continuation of the pursuit. Pursuit may be terminated by the pursuing officer, the field supervisor or the duty officer.

2. Pursuit shall be immediately terminated in any of the following circumstances:

a. Weather or traffic conditions substantially increase the danger of pursuit beyond the worth of apprehending the suspect.

b. The distance between the pursuit and fleeing vehicles is so great that further pursuit is futile.

c. The danger posed by continued pursuit to the public, the officers or the suspect(s) is greater than the value of apprehending the suspect(s).

3. The pursuing or supervising officer must consider present danger, seriousness of the crime, length of the pursuit and the possibility of identifying the suspect at a later time when determining whether or not to continue the pursuit.

4. The pursuing officer shall relay this information to communications personnel, along with any further information acquired, which may assist in an arrest at a later date.

Because the policy did not adequately meet the requirements of Utah Code section 41–6a–212, we conclude that Ogden City's policy does not grant Ogden City immunity. However, the absence of immunity does not establish negligence. Thus, while we conclude that Ogden City's policy did not grant it immunity under the statute, we decline Plaintiff's invitation to enter a directed ver-

---

**19.** Utah Code § 41–6a–212(4)(b).

dict concluding as a matter of law that Ogden City was negligent.

¶ 35 We note that if Exhibit D–101 is authenticated and admitted on remand, it might give Ogden City immunity. But if it does not, the question of Ogden City's negligence remains at issue. The negligence analysis in this factual setting is controlled by *Day v. State (ex rel. Utah Dep't of Pub. Safety )*,[20] and is ultimately a factual question to be answered by the jury in the new trial.

### C. The Trial Court Did Not Err in Excluding Evidence Attacking Officer Jones's Credibility

■ ¶ 36 Plaintiff sought to introduce evidence that Officer Jones was terminated from his employment after the accident at issue in this case. The proposed evidence would have shown that Officer Jones was investigated for various incidents: (1) he took baby chicks from the site of an illegal cockfight but should have turned them over as evidence; (2) he took money from illegal aliens during traffic stops and, in furtherance of the scheme, occasionally mis-reported his location; and (3) his wife drove a van displaying a banner critical of the mayor. Plaintiff wished to introduce the evidence in order to undermine Officer Jones's credibility. The trial court excluded all of this evidence under rule 404(b) of the Utah Rules of Evidence, which states:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

The trial court explained that it was "not persuaded that [Plaintiff is] offering this evidence for a proper non-character purpose under Rule 404(b). Rather, it is being offered to show that Officer Jones had a propensity to commit misconduct, a purpose that is forbidden by Rule 404(b)."

¶ 37 The trial court went on to say that "[e]ven if the Court were to find a proper non-character purpose, the Court would still exclude this evidence under Rule 403." Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The trial court evaluated the evidence and its bearing on the case and "determine[d] that whatever scant probative value this evidence might have is substantially outweighed by the danger of unfair prejudice." The trial court also opined that

> [t]he dangers of confusion of the issues and misleading the jury are also present. The jury will be tasked with deciding important and complicated issues in this case, and this evidence would likely distract the jury from the most important issues in the case. Presentation of this evidence would also waste a significant amount of time at trial.

Thus, the trial court excluded the evidence under several aspects of rule 403.

¶ 38 Plaintiff also sought to admit the evidence to directly impeach Officer Jones's credibility under rule 608(b) and 608(c) of the Utah Rules of Evidence. Rule 608(b) provides, in relevant part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning the witness' character for truthfulness or untruthfulness[.]

Rule 608(c) provides that "[b]ias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced." The trial court "determine[d] that the minimal probative value of the evidence, whether to show Officer Jones's bias, character for untruthfulness, or otherwise, was sub-

---

**20.** 1999 UT 46, ¶¶ 31–32, 980 P.2d 1171 (explaining the duty of care required of police officers and other drivers of emergency vehicles).

stantially outweighed by the dangers and considerations identified in Rule 403." The trial court did not, however, "preclude [Plaintiff] from inquiring into these matters on cross-examination to impeach any specific affirmative representation Officer Jones may make at trial if it is inconsistent with the evidence. The court rules only that [Plaintiff] may not use the evidence to impeach Officer Jones's credibility *generally*."

¶ 39 On appeal, Plaintiff argues that the trial court abused its discretion when it excluded the evidence concerning Officer Jones's on-the-job dishonesty. Plaintiff's argument is directed only at the trial court's 608(b) ruling, and does not even attempt to overcome the trial court's exclusion of the evidence under rule 403. "[W]e grant a trial court broad discretion to admit or exclude evidence and will disturb its ruling only for abuse of discretion," and then only if "the ruling was beyond the limits of reasonability." [21] Here, the trial court's reasoning for excluding the evidence under rules 403 and 404(b) is well within the limits of reasonability. In our view, the trial court did not abuse its discretion in determining that whatever probative value the evidence may have had, it was outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, [or] waste of time or needless presentation of cumulative evidence." [22] We therefore affirm the trial court's· ruling on this issue.

## CONCLUSION

¶ 40 Ogden City violated the trial court's order in limine when it asked Theresa Nelson inappropriate questions concerning Jessica, Mr. Ellis, and Thomas Nelson. These violations and the improper questioning were unfairly prejudicial to Plaintiff. We conclude that it is likely that the jury's verdict was impacted by the inappropriate questioning. We therefore reverse and remand for a new trial.

¶ 41 On remand, the trial court is instructed first that Exhibit D–101 should not be admitted unless it can be authenticated. Second, the trial court is instructed that Ogden City's policy did not comply with Utah Code section 41–6a–212 and Ogden City is not thereby granted immunity. But we decline to conclude as a matter of law that Ogden City was negligent. We conclude only that Ogden City did not have immunity by virtue of its policy. Whether it had immunity under some other policy is a question that will be determined if Exhibit D–101 is authenticated and admitted. If Ogden City did not have immunity, the question of whether it was "at fault" is a factual question for the jury. Finally, we affirm the trial court's exclusion of evidence concerning Officer Jones's character. We also reverse the award of costs.

Justice LEE, dissenting:

¶ 42 I respectfully dissent from the court's decision to order a new trial in this case. First, although I agree that defense counsel asked objectionable questions at trial, I would defer to the trial court's finding that no substantial prejudice resulted from those questions and affirm its denial of the motion for new trial. Second, as to Ogden City's vehicle pursuit policy, I would find that it complies with Utah Code section 41–6a–212 and that the City accordingly qualifies for a privilege under its terms. That conclusion forecloses plaintiff's remaining arguments on appeal, and I would thus affirm the jury verdict in defendants' favor.

I

¶ 43 I agree with the majority's conclusion that defense counsel asked questions at trial that ran afoul of the district court's orders in limine and that sought to elicit irrelevant testimony. But the district court likewise agreed and thus sustained plaintiff's counsel's objections at trial. The question before us on appeal, then, is not the propriety of defense counsel's questions, but their prejudicial effect on the jury. On that question,

---

**21.** *Daines v. Vincent*, 2008 UT 51, ¶ 21, 190 P.3d 1269 (internal quotation marks omitted).

**22.** UTAH R. EVID. 403.

the district court found that any prejudice was minor and thus denied plaintiff's motion for new trial.

¶ 44 The trial judge's assessment on that point is entitled to substantial deference. *See Child v. Gonda*, 972 P.2d 425, 429–30 (Utah 1998); *Schmidt v. Intermountain Health Care, Inc.*, 635 P.2d 99, 101 (Utah 1981). We are in no position to make a de novo analysis of the effect of an isolated line of questioning on the fairness of a five-day trial. The trial judge was intimately involved in the trial proceedings from start to finish. He heard defense counsel's questions firsthand and had a personal view of the jury's reaction to them. Having presided over the entire trial, moreover, the trial judge was in a position to assess the relative impact of these questions on the fairness of the proceeding in its entirety.[1] We should accordingly defer to his conclusion that any prejudice to plaintiff's case was "relatively minor" given that the court sustained an immediate objection to the defense question about Bob Ellis's "criminal history dealing with prostitution."

¶ 45 The majority makes no mention of the appropriate standard of review of this ruling. Instead, after admonishing defense counsel for asking inappropriate questions, the court "[t]hus" concludes "that the trial court erred in not granting ... a new trial on the ground that Ogden City had violated the orders in limine in a way that was prejudicial to Plaintiff's case." *Supra* ¶ 23. But the notion of prejudice sufficient to warrant a new trial does not at all follow automatically from the determination of error. If a new trial were required every time an objection was sustained, our justice system would grind to a halt. To justify the expense and delay of a new trial, plaintiff bore the burden of demonstrating that irregularity in the trial proceed-

ings "prevented [her] from having a fair trial."[2] And where the trial court finds that that is not the case, we owe substantial deference to that judgment for reasons explained above.

¶ 46 The applicable standard of review allows us to reverse only upon establishing an abuse of the trial court's discretion. *Child*, 972 P.2d at 429; *Schmidt*, 635 P.2d at 101. I see no basis for finding an abuse of discretion here. At trial, the judge took adequate and appropriate action—everything within his power—to limit and control the damage from defense counsel's questions. When counsel vaguely suggested that Jessica Jones and Bob Ellis were involved in something "odd" and "doing who knows what," the court sustained plaintiff's objection and granted a motion to strike the reference to "who knows what," noting the potential for a negative inference from that phrase. And when the defense subsequently asked whether the witness was aware that Ellis "had a criminal history dealing with prostitution," plaintiff's counsel made an immediate objection. That objection was sustained without an answer from the witness. So in context the jury's impression would simply have been that the judge had rebuked defense counsel for asking an improper question.

¶ 47 In fact, before the objection was sustained, plaintiff's counsel coupled his objection with an understandable diatribe about the "outrageous" nature of the question given the in limine order from the court. *Supra* ¶ 13. In addition, plaintiff's counsel was able to note that "Bob Ellis is dead, and his history has nothing to do with this and she's trying to besmirch Jessica Nelson by using this improperly, and she knows it." *Supra* ¶ 13. Thus, by the time the court sustained plaintiff's objection, the jury had heard plenty about the problems with defense counsel's

---

1. *See Child v. Gonda*, 972 P.2d 425, 430 (Utah 1998) (explaining that "great deference" is given to the trial court in decisions denying motions for new trial given that it "is in a much better position than this court to evaluate the parties' conduct, the context in which the irregularity occurred, and the jury's reaction to the statement"); *Schmidt v. Intermountain Health Care, Inc.*, 635 P.2d 99, 102 (Utah 1981) (noting that deference is due because the trial court's "position allows him to hear the remarks of the attor-

neys and the witnesses, view the jury, and observe the general mood in the courtroom," so that "the trial judge is the one especially well-suited to evaluate" the impact of an evidentiary error on the jury).

2. Utah R. Civ. P. 59(a)(1) (providing that "[i]rregularity in the proceedings" does not warrant a new trial unless a "party was prevented from having a fair trial").

question, such that the decision to sustain the objection must have been perceived as a clear rebuke of the defense's tactic.

¶ 48 The trial judge obviously thought that was enough to remove any substantial risk of prejudice to the jury. That judgment falls squarely within the range of discretion afforded to trial judges, to whom we assign the monumental task of making the hundreds of snap decisions required to manage the proceedings when things do not go perfectly (as they never do), and to make fact-sensitive judgments about the impact of errors on the overall fairness of the trial. Our deference ought to be enhanced, moreover, given that plaintiff's counsel himself seemed satisfied with the trial judge's action (to sustain the objection) at the time, and that he failed to request a curative instruction or any such remedy.[3] And absent a request for such an instruction, we can reverse here only if we find that a curative instruction would not have cured any harm and that the only permissible response was to scrap the whole case and declare a mistrial.[4]

¶ 49 I do not doubt that some improper questions could be sufficiently poisonous to justify such a sweeping remedy. But neither the plaintiff nor the court has offered any reason to treat the question about Bob Ellis's criminal history as irrevocably tainting the trial, and I cannot agree with the majority's decision to do so. The question under review did not concern a party to the litigation. Nor was there any insinuation as to a party's action in conformity with a prior criminal act. Instead, the question raised the specter of a third party's criminal history in a manner that by implication could cause the jury to question a party's worthiness for a verdict by association. That, of course, was highly inappropriate. But I think we can trust juries to disregard such questionable tactics, especially in the face of a trial court's decision rebuking them. And in any event the trial judge here trusted this jury to do so, and we owe him deference in that judgment. I accordingly dissent from the court's decision ordering a new trial on the basis of defense counsel's improper questions at trial.

II

¶ 50 As for the other errors relied on by the majority in ordering a new trial, I would affirm on the ground that the City's pursuit policy satisfied Utah Code section 41–6a–212 and entitled it to a privilege under that statute. The majority reaches a contrary conclusion on the basis of its assertion that the policy "describ[ed] the circumstances, but not the manner, in which any vehicle pursuit

---

3. *See* Robert J. Martineau et al. Appellate Practice & Procedure. Cases & Materials 101 (2d ed. 2005) ("[T]he cases are legion in holding that if an appellant objects and the objection is sustained but he does not move for a curative instruction or request a mistrial, he has received what he asked for and cannot be heard to complain on appeal."); *see also, e.g., Cassim v. Allstate Ins. Co.*, 33 Cal.4th 780, 16 Cal.Rptr.3d 374, 94 P.3d 513, 520 (2004) ("[T]o preserve for appeal an instance of misconduct of counsel in the presence of the jury, an objection must have been lodged at trial. In addition to objecting, a litigant faced with opposing counsel's misconduct must also move for a mistrial or seek a curative admonition unless the misconduct is so persistent that an admonition would be inadequate to cure the resulting prejudice. This is so because [o]ne of the primary purposes of admonition at the beginning of an improper course of argument is to avoid repetition of the remarks and thus obviate the necessity of a new trial." (second alteration in original) (internal quotation marks and citations omitted); *Stolte v. Fagan*, 311 Ga. App. 123, 714 S.E.2d 339, 340 (2011) (refusing to "reverse a trial court for not taking an action that was not requested at trial," and explaining that the appellant had "acquiesced in the trial court's response" to her objection "by failing to [further] complain when the court sustained her objection" and to ask for a rebuke of counsel or for a curative instruction (internal quotation marks omitted)), *cert. granted*, No. S11G1871 (Mar. 19, 2012)); *Beverly Enterp., Inc. v. Spragg*, 695 N.E.2d 1019, 1022 (Ind.Ct.App.1998) ("Had [the appellant] believed itself to be prejudiced, its remedy would have been to ask for a mistrial, or even for an admonition, neither of which it requested. A party may not, by action or inaction, await the verdict and then seek to set it aside for error that could have been averted or corrected." (internal quotation marks omitted)).

4. *See Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 707 (Tex.Ct.App.2008) (requiring litigant who objected to improper jury argument but did not request a curative instruction to "show that the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not [have] remove[d] its effects" (internal quotation marks omitted)).

should be conducted and terminated." *Supra* ¶ 34. I respectfully disagree.

¶ 51 The Ogden City policy expressly states that it is "regulat[ing] the *manner* in which vehicular pursuit is undertaken and performed." (Emphasis added). And its terms undoubtedly do so. First, the policy directs officers to "conduct pursuits in compliance with U.C.A. Section 41–6–14, sound professional judgement [sic], compliance with other department policies, i.e., seat belt use, and the procedures outlined in this policy." The incorporated statute itself says plenty about the manner of initiating and performing the pursuit, as the statute in place at the time of this policy required the operator of the vehicle to conduct the pursuit by sounding an "audible signal" and using a "visual signal … visible from in front of the vehicle." Utah Code § 41–6a–212(3)(a). The Ogden policy elsewhere adds additional requirements regarding the manner of initiating and performing the pursuit, requiring officers to "clearly indicate their intent to stop the vehicle and arrest the subject by employing the use of both lights and siren" and to "immediately notify communications center personnel that a pursuit is underway." [5]

¶ 52 The policy likewise prescribes the manner of terminating the pursuit. It does so by prescribing specific circumstances in which pursuit is to be terminated, and by requiring that the termination be "immediate." Those circumstances are: "a. Weather or traffic conditions substantially increase the danger of pursuit beyond the worth of apprehending the suspect. b. The distance between the pursuit and fleeing vehicles is so great that further pursuit is futile. c. The danger posed by continued pursuit to the public, the officers or the suspect(s) is greater than the value of apprehending the suspect(s)."

¶ 53 Plaintiff contends that this policy prescribes only the "circumstances" for terminating the pursuit and not its "manner."

That strikes me as a "gotcha" construction that ignores the obvious import of the policy. The requirement that "[p]ursuit shall be immediately terminated" in certain circumstances is an unmistakable directive for police officers to stop pursuing by slowing down and ceasing the pursuit. The obvious way to stop pursuing is to stop pursuing.

¶ 54 In fact, the policy says so explicitly through its express definition of "Vehicular Pursuit" as "[a]n active attempt by one or more officers operating a department motor vehicle to apprehend a fleeing suspect operating a motor vehicle while trying to avoid apprehension by using high speed driving or other evasive tactics." In light of that definition, the requirement to "immediately terminate[ ]" a vehicular pursuit is an express requirement for the officer to immediately stop the "active attempt" to apprehend a suspect who is fleeing by evasive tactics. The policy undoubtedly could have said more about the "manner" of terminating the pursuit. But the statute does not require elaborate detail about the manner of termination; it requires only a mere description of "the manner and circumstances in which any vehicle pursuit should be conducted and terminated." Utah Code § 41–6a–212(4)(b). The Ogden City policy easily meets that standard, and Ogden City is accordingly entitled to claim a privilege under the Utah Code.

¶ 55 That conclusion forecloses plaintiff's claim that she was entitled to a directed verdict on the basis of Ogden City's per se negligence. I would reject that claim on the ground that Ogden City qualified for a privilege under Utah Code section 41–6a–212. That privilege, moreover, renders irrelevant any authentication issues regarding Exhibit D–101. If Ogden City complied with the privilege statute, then it is irrelevant whether a purported model policy may have tricked the jury into thinking that because the City's

---

5. The responsibilities of other employees in the manner of the pursuit are also described in detail in the policy. Communications personnel, for example, are required to "immediately advise a field supervisor of essential information regarding the pursuit" and to perform a list of specific responsibilities set forth in the policy. The field supervisor's responsibility is also prescribed in the policy. He is to "assume responsibility for the monitoring and control of the pursuit" by, among other things, "continuously review[ing] the incoming data to determine whether the pursuit should be continued or terminated."

policy was like the model, it satisfied the statute.